# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4341 | **DATE** | 3/31/2004 |
| **CASE TITLE** | Aida vs. City of Chicago, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Father Pfleger and the Catholic Bishop of Chicago's Motion to Dismiss [15-1]; City Defendants Partial Motion to Dismiss [17-1]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached memorandum opinion and order, both motions to dismiss [15-1] and [17-] are GRANTED. All claims against Father Pfleger and the Catholic Bishop of Chicago are dismissed, with prejudice, in their entirety. Additionally, the Defendant's partial motion to dismiss is granted. The following claims are dismissed with prejudice: (1) Plaintiffs' substantive due process claims; and (2) Count II of Plaintiffs' Complaint. The following claims are dismissed without prejudice: (1) Claims of municipal and official capacity liability (with the exception of John Robertson, where the official and individual capacity claims are dismissed without prejudice); (2) Plaintiffs' procedural due process claims (3) Any Fourteenth Amendment claims. Plaintiffs are granted leave to amend complaint, any amendments must be made by April 30, 2004. Status hearing set for May 13, 2004 at 9:00.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | MAR 31 2004 | | 28 |
| | Notified counsel by telephone. | | date docketed | | |
| X | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | | |
| | Copy to judge/magistrate judge. | | | | |
| slf (lc) | courtroom deputy's initials | 2004 MAR 31 PM 3:12 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AIDA FOOD AND LIQUOR, INC., and )
EASSA FAKHOURY, )
)
        Plaintiffs, )
)
        v. )
)
THE CITY OF CHICAGO, a municipal )
corporation, JOHN ROBERTSON, )
individually and in his capacity as )
Department of Buildings Commissioner, )
TIMOTHY HUTCHINSON, individually )
and in his capacity as Department of )
Buildings Deputy Commissioner, DON )
GIBBSON, individually and in his capacity )
of Departments of Buildings inspector, )
CECILIA COFFMAN, individually and in )
her capacity as Department of Public Health )
inspector, LATASHA R. THOMAS, )
individually and in her capacity as Alderman )
of the 17th Ward, REV. MICHAEL L. )
PFLEGER, individually and in his capacity )
as Pastor of the Faith Community of St. )
Sabina Church, and THE CATHOLIC )
BISHOP OF CHICAGO, a corporation sole, )
)
        Defendants. )

No. 03 C 4341

HONORABLE DAVID H. COAR

SCANNED
MAR 3 1 2004

## MEMORANDUM OPINION AND ORDER

Before this court are two motions to dismiss. The first motion to dismiss was filed on behalf of

Rev. Michael L. Pfleger ("Father Pfleger") and the Catholic Bishop of Chicago, to dismiss all

claims against them. The second motion to dismiss was filed by the City of Chicago, including

various officials and employees named in Plaintiffs' suit ("City" or "City Defendants"). The

motion filed by the City Defendants requests dismissal of all but the Plaintiffs' Fourth Amendment claims. For the reasons set forth below, both motions to dismiss are granted. All claims against Father Pfleger and the Catholic Bishop of Chicago are dismissed, with prejudice, in their entirety. Additionally, City Defendants' partial motion to dismiss is granted. The following claims are dismissed with prejudice: (1) Plaintiffs' substantive due process claims; and (2) Count II of Plaintiffs' Complaint. The following claims are dismissed without prejudice: (1) Claims of municipal and official capacity liability (with the exception of John Robertson, where the official *and* individual capacity claims are dismissed without prejudice); (2) Plaintiffs' procedural due process claims; and (3) Any Fourteenth Amendment claims that are independent of the claims raised in Plaintiffs' Section § 1985 (3) cause of action.

**FACTUAL BACKGROUND**

Eassa Fakhoury ("Fakhoury" ) is the President and sole shareholder of Aida's Food and Liquor, Inc ("Aida"), which is also owned by Fakhoury.[1] (Pl. Comp. ¶ 3). The property is two-story building located at 7023 Halsted Street in Chicago, in which Aida and a Chinese store operate. Id. Plaintiffs' claims arise from what Fakhoury believes is the Defendants' attempts to force him out of business. On June 29, 2000, Fakhoury received a letter from the city of Chicago, indicating that his property had been designated by the City management for acquisition (Pl. Comp. ¶ 4). However, the City management was unsuccessful in getting the U.S. Department of Housing and Urban Development to purchase the property. (Pl. Comp. ¶ 5). Subsequently, the developments the City, State, and Federal governments made to surrounding

---

[1]Fakhoury and Aida are referred to collectively as "Plaintiffs"

property caused Plaintiffs' property value to double. (Pl. Comp. ¶ 6). Immediately thereafter, City inspectors began to visit Plaintiffs' store up to three times a week, when in the past, inspectors would only visit the store once or twice a year. (Pl. Comp. ¶ 7). These frequent visits led to certain actions and decisions that Plaintiffs believe resulted in constitutional violations.

## I.   Visits from Cecilia Coffman, Department of Public Health Inspector

On February 22, 2001, Defendant Cecilia Coffman ("Coffman"), an inspector with the Department of Public Health, came to inspect Fakhoury's store, and found a small gap on the front door. (Pl. Comp.¶ 15). The following week, on March 1, 2001, Coffman returned to inspect the door and found that it was still in violation of the applicable code provision. Id. Plaintiffs' store was shut down, and Fakhoury had to pay $2500 in fines to the City. Id.

On a subsequent visit, Coffman cited Plaintiffs for having a two compartment sink, and required that Fakhoury replace it with a one compartment sink, which cost $300. (Pl. Comp. ¶ 16). Coffman regularly came to the store and cited Plaintiffs with numerous violations regarding the cold cuts in the deli area in the store. On more than ten different inspections, Coffman required that Plaintiffs throw out all of the cold cuts in the deli. (Pl. Comp. ¶ 17). This cost Plaintiffs hundreds of dollars, and eventually, they permanently closed the deli area of the store. Id.

## II. Required Maintenance of Vacant Lot Adjacent to Plaintiffs' Property

On the morning of March 11, 2001, Lieutenant Laskey ("Laskey") of the Chicago Police Department came to Plaintiffs' store, and told Fakhoury there were beer bottles and cans in a vacant lot adjacent to Plaintiff's store. (Pl. Comp. ¶ 18). Although the lot is owned by City, Laskey cited Plaintiff with a violation, which caused the City to revoke Plaintiffs' liquor license

without a hearing. Id.[2] City police and inspectors required the Plaintiffs to maintain the adjacent vacant lot, although it is City property, and would issue citations and fines if the lot was not maintained. (Pl. Comp. ¶ 19).

On March 8, 2002, inspectors came to Plaintiffs' store and issued a citation for bricks on the adjacent lot, and an ice machine in the store. (Pl. Comp. ¶ 21). Plaintiffs were required to go to court and pay a $500 fine. Id. On August 8, 2002, an inspector came while repairmen were working on the store's chimney and issued a citation to Plaintiffs, requiring that they pay a $100 fine for having some of the chimney's bricks laying on the empty adjacent lot. (Pl. Comp. ¶ 22).

## III. Allegations That Father Pfleger's Complaints Resulted in Numerous Building Code Violations for Plaintiffs

Plaintiffs also allege that Father Pfleger, a pastor at the Faith Community of St. Sabina Church, and his parishioners, attempted to force Plaintiffs out of business by making complaints to the City. (Pl. Comp. ¶ 23). Father Pfleger and his parishioners came into Plaintiffs' store to inspect and make certain requests, including that Fakhoury discontinue the sale of tobacco products in his store. Id. Plaintiffs claim that following visits from Father Pfleger or his parishioners, a City inspector would visit Plaintiffs' store and make the same complaints that Father Pfleger or his parishioners did. Id.

One particular example of this practice occurred on August 20, 2002. On that date, Father Pfleger sent a letter to Plaintiffs that complained about an electrical box in the store. (Pl.

---

[2] The Plaintiffs can still sell liquor because they possess a state liquor license, which can only be revoked after a hearing is held on the violation. (Pl. Comp. ¶ 18). However, because the City still has not conducted a hearing on the revocation of the city license, Plaintiffs face increased administrative burdens and costs in maintaining the state liquor license. (Pl. Comp. ¶ 18).

Comp. ¶ 24). On August 22, 2002, Don Gibson ("Gibson"), an inspector for the Department of Buildings, came to inspect the electrical box, and based on his inspection, ordered that Plaintiffs' entire building be shut down.[3] (Pl. Comp. ¶ 24). Subsequently, Fakhoury attempted to complete the necessary work repairs. However, Hutchinson informed Plaintiff that he could not issue a work permit without approval from Latasha Thomas, Plaintiff's Alderwoman. (Pl. Comp. ¶ 30). However, Plaintiffs were unable to obtain that approval. (Pl. Comp. ¶ 31).

On September 24, 2002, an order was entered that allowed Plaintiffs to commence work in the store immediately, and directed the Department of Buildings to issue a work permit within fourteen days. (Pl. Comp. ¶ 34). Later that same day, a Department of Buildings inspector placed a large "stop work" sticker on Plaintiffs' store window. Id. However, Plaintiffs commenced repair work on the electrical system. Id. The following day, a police officer and a Department of Buildings inspector came to the store and attempted to stop the work, but Fakhoury presented the court order and refused to stop. Id. Similar circumstances arose on October 4, 2002. A police officer came to the store and demanded that everyone stop working, but again, Fakhoury showed the officer the court order and refused to stop working. (Pl. Comp. ¶ 35).

---

[3]On August 16, 2002, in the Circuit Court of Cook County, a hearing was held to address Plaintiffs' building's electrical issue. (Pl. Comp. ¶ 25). An order was entered directing Fakhoury to make repairs to the electrical units and wires within the building in accordance with the instructions of Kevin Callahan ("Callahan"), an inspector with the Department of Buildings, by October 11, 2002. Id. Judge Sheehan, with the consent of Callahan, allowed the Plaintiff to keep his entire building open while repairs were made. Id. However, when Plaintiff showed the court order to Gibson, and Timothy Hutchinson, Deputy Commissioner for the Department of Buildings ("Hutchinson"), they stated that the present electrical violation was different from the electrical violation that Callahan cited, and therefore the August 16, 2002 court order was not applicable. (Pl. Comp. ¶ 28)

Plaintiffs completed the necessary work on October 7, 2002. (Pl. Comp. ¶ 37). On October 8, 2002, Plaintiff contacted Inspector Larry Doggette ("Doggette"), who agreed to come and inspect the store's electrical system, although he was advised by his supervisors not to inspect Plaintiffs' store. Id. On October 11, 2002, at a scheduled court hearing before Judge Cunningham, City assistant corporation counsel, Christopher Grunewald, could not explain to the Judge why the Department of Buildings refused to comply with his September 24, 2002 order directing the City to issue a work permit. (Pl. Comp. ¶ 38). Additionally, inspector Doggette came to the court hearing, and testified that the electrical work was completed. Id.[4] However, most of the forty violations in Gibson's complaint were not completed and Plaintiffs did not dispute this fact. Id. Notwithstanding the fact that all violations were not remedied, Grunewald withdrew Gibson's complaint, and the court issued an order dismissing the complaint, which allowed the Plaintiffs to open their store. Id. After the store opened, the Department of Buildings sent inspectors and police officers to Plaintiffs' store to attempt to shut it down. (Pl. Comp. ¶ 41). The Plaintiff presented the court order, refused to have his business shut down, and had to physically stop the police and inspectors from shutting down the store. Id. No arrests were made, but the Defendants continued to send inspectors who attempted to shut the store down. Id.

On October16, 2002, John Moran ("Moran") a plumbing inspector, came to Plaintiffs' store to conduct an inspection. Moran attempted to shut down the entire building due to plumbing problems in the basement. (Pl. Comp. ¶ 43). Fakhoury physically stopped Moran from going into the basement, and Plaintiffs' attorney threatened to hold Moran personally liable. (Pl.

---

[4] On November 26, 2002, Doggette informed Fakhoury that he was suspended for three days by the Department of Buildings for inspecting Plaintiff's store and testifying that Plaintiff completed the necessary electrical work. (Pl. Comp. ¶ 40)

Comp. ¶ 42).  The following day, Ed Shields ("Shields"), a Department of Buildings electrical inspector, arrived at Plaintiffs' store to conduct an inspection.  (Pl. Comp. ¶ 43).  Shields asked why the store was opened, and demanded that the store be shut down.  Id.  Fakhoury showed the October 11, 2002 court order to Shields, and told him that he would physically stop anyone from shutting down the store.  Id.

## IV. Plaintiffs' Failed Attempts to Purchase Adjacent Lot

Plaintiffs made numerous attempts to purchase the vacant lot adjacent to his store.  (Pl. Comp. ¶ 49).  City officials refused to sell the lot to Plaintiffs unless they obtained a letter of support from Alderwoman Thomas.  Id.  However, Alderwoman Thomas refused to issue the letter of support.  Id.  City inspectors and police officers continued to require that Plaintiffs maintain the lot, or be subject to citations and fines.  (Pl. Comp. ¶ 50).

## V. Plaintiffs' Failed Attempt to Acquire Building Permit for Chinese Restaurant

On June 11, 2003, Fakhoury hired Larry Steve ("Steve"), a contractor, to make repairs to the Chinese restaurant so that Plaintiffs could open it for business.  (Pl. Comp. ¶ 51)  On June 12, 2002, Steve went to the Department of Buildings to obtain a work permit.  Steve was informed that the application for the work permit was complete, and all he needed was the Alderwoman's approval.  Id.  On June 16, 2003, Steve went to Thomas' office, where approval was refused.  Id.  Steve told Fakhoury there was "something like a lien on the building in the Department of Buildings' computer" that prohibits any work permit from being issued without Thomas' approval. (Pl. Comp. ¶ 51).

## DISCUSSION

### I. Legal Standard for a Motion to Dismiss

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "must accept all well pleaded allegations as true. In addition, the Court must view these allegations in the light most favorable to the plaintiff." Gomez v. Illinois Board of Education, 811 F.2d 1030, 1039 (7th Cir.1987). A party's claim should only be dismissed if it is clear that no set of facts in support of the claim would entitle the party to relief. Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir. 1997). (quoting Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984)).

### II. Analysis of Plaintiffs' Claims

Plaintiffs bring claims under 42 U.S.C. § 1983 ("Section 1983"), alleging that the City Defendants, under color of law, violated certain constitutional rights. In Count I, Plaintiffs allege a violation of the Fourth Amendment right against unreasonable search and seizure.[5] Additionally, the Plaintiffs allege that the Defendants deprived them of their procedural and substantive due process rights under the Fifth Amendment. In Count II, Plaintiffs allege a conspiracy in violation of 42 U.S.C. § 1985(3). Plaintiffs allege that Father Pfleger and his parishioners conspired with the City Defendants to violate their Fourth, Fifth and Fourteenth Amendment rights. The Court will address Plaintiffs' Claims in the following order: (1) Plaintiffs' Count I § 1983 claims against City Defendants; (2) Plaintiffs' Count I and Count II claims Against Father Pfleger and the Catholic Bishop of Chicago; and (2) Plaintiffs' § 1985(3) claims against the City Defendants.

---

[5] The City Defendants do not move to dismiss this claim under Fed. R. Civ. P. 12 (b) (6).

### A. Plaintiffs' Count I § 1983 Claims Against City Defendants

#### 1. Legal Standard for § 1983 Claims

Plaintiffs contend that under color of law, various City employees and officials from the Department of Buildings, Department of Public Health, and Alderwoman Thomas, infringed their Fifth and Fourteenth Amendment rights. Section 1983 "is not itself a source of substantive rights," but rather provides "a method for vindicating federal rights elsewhere conferred." Baker v. McCollan, 443 U.S. 137, 144, n.3 (1979). The first step in a § 1983 claim is to identify the specific constitutional right allegedly infringed. Albright v. Oliver, 510 U.S. 266, 271 (1994). Therefore, in order to establish a valid claim under § 1983, Plaintiffs must establish that the various city employees and officials, under color of law, violated their rights under the Fifth and Fourteenth Amendments.

#### 2. Is Municipal Liability Properly Alleged?

Before liability can attach under § 1983, a Plaintiff must properly allege an appropriate legal basis for that liability. The City Defendants contend that the Plaintiffs have failed to properly plead municipal liability with respect to: (1) the City of Chicago; (2) City officials and employees in their official capacity; and (3) Commissioner John Robertson of the Department of Buildings in his official *and* individual capacities.

##### a. Plaintiffs' Allegations of Municipal Liability

Plaintiffs name the City of Chicago as a defendant, apparently under a theory of *respondeat superior*. However, *respondeat superior* is not a basis for rendering municipalities liable for the constitutional torts of their employees under § 1983. Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 663, n.7 (1973). The Plaintiffs must show

either: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir. 1995). Plaintiffs' Complaint does not sufficiently allege under which theory the City of Chicago should be liable, and in fairness to their adversaries, Plaintiffs must "apprise [defendants] of the substance of the allegations." Uptown People's Community Health Services Bd. of Directors v. Bd. of Comm'rs of Cook County, 647 F.2d 727, 739 (7th Cir. 1981) (citing Cohen v. Illinois Institute of Technology, 524 F.2d 818 (7th Cir. 1975)).

### b. Plaintiffs' Allegations of "Official Capacity" Liability

Additionally, Plaintiffs fail to state under what theory of liability the city officials, in their official capacity, are being sued. When suit is brought against a government officer in his or her official capacity, the Plaintiff is actually suing the government entity for which that officer works. McMurry v. Sheahan, 927 F.Supp. 1082, 1089 (N.D. Ill. 1996) (citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)). To properly state a claim for liability based upon official capacity, "a plaintiff must allege that the defendant promulgated or enforced a policy or custom in his official capacity as one with decisional authority, which led to the deprivation of Plaintiff's constitutional rights." McMurry, 927 F.Supp. at 1088-89 (citing Monell, 436 U.S. 658)). "The government entity, through its officers, in establishing or maintaining a policy or custom, must be the moving force behind the deprivation." Id. Based upon this standard, Plaintiffs have failed to properly allege how the officials named in their suit are liable. Therefore, Plaintiffs' claims against the

-10-

City of Chicago, and all named officials and employees of the City of Chicago (in their official capacity), are dismissed without prejudice, as Plaintiffs must properly allege a basis for liability in order to state a claim for relief.[6]

### 3. Plaintiffs' Procedural Due Process Claims

Plaintiffs contend that the City of Chicago deprived them of their procedural due process rights to their: (1) business, by shutting down the store and refusing to issue a work permit; (2) liquor license, by revocation without a hearing; (3) the vacant adjacent lot. To analyze a procedural due process claim under § 1983, the Court must engage in a two-step analysis. The Court must determine whether: (1) the Plaintiffs have been deprived of a protected interest; and (2) If so, determine what process is due. Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir. 1996) (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Doherty, 754 F.3d at 322. The state is not always required to provide a pre-deprivation hearing when a loss involves property. Hudson v. Palmer, 468 U.S. 517, 533 (1984). In Hudson the Court held:

> An unauthorized intentional deprivation of a property interest does not constitute a violation of the Due Process clause if a meaningful postdeprivation remedy for the loss is available. Id. at 533. [A] complaint does not state a valid procedural due process

---

[6] Plaintiffs also bring suit against all City Defendants in their individual capacities. Plaintiffs state a claim for relief against Hutchinson, Gibbson, Coffman and Thomas in their individual capacities, as the Complaint alleges that they caused or participated in the violation of his Constitutional rights. See Wolfe-Lille v. Sonquist, 699 F. 2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in the alleged constitutional deprivation.") However, there is no allegation that John Robertson personally participated in a constitutional deprivation. Consequently, Plaintiffs' suit against Robertson in his individual capacity is dismissed without prejudice.

objection–and a valid § 1983 claim–if it does not include a challenge to the fundamental fairness of the state's procedures...[I]f a procedural due process claim lacks a colorable objection to the validity of the State's procedures, no constitutional violation has been alleged.

Hudson, 468 U.S. at 539. Therefore, a plaintiff must avail herself of the remedies guaranteed by state law or demonstrate that the available remedies are inadequate. Doherty, 75 F.3d at 323.

As an initial matter, the Court must address whether the Plaintiffs have a property interest in the vacant lot next their business, because, "[i]n any case alleging a denial of due process for the deprivation of a property right, the basic question is whether the property right exists." Zemke v. City of Chicago, 100 F.3d 511, 513 (7th Cir. 1996). The right to the property must involve a "legitimate claim of entitlement." New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474, 1479 (7th Cir. 1990) (citing Board of Regents v. Roth, 408 U.S. 564, 577 (1972)). Plaintiffs' state that the vacant lot is owned by the City of Chicago. (Pl. Comp. ¶ 18). Therefore, Plaintiffs have no property rights to this vacant lot, and cannot make any procedural due process claims with regard to that property.

However, accepting Plaintiffs' facts as true, they have a vested property interest in their place of business, work permit, and liquor license. However, Plaintiffs' claims of procedural due process are inadequate, as they do not allege that Plaintiffs' availed themselves of all remedies guaranteed by state law; nor do Plaintiffs' claims allege that those state remedies are inadequate. Therefore, with respect to Plaintiffs' procedural due process claim concerning their place of business, building permit, and liquor license, those claims are dismissed without prejudice. Plaintiffs must claim that they availed themselves of all appropriate state remedies or that those remedies are inadequate.

#### 4. Plaintiffs' Substantive Due Process Claims

As with their procedural due process claims, Plaintiffs' substantive due process claims allege an unconstitutional deprivation of their: (1) business; (2) liquor license; and (3) the adjacent vacant lot. Because the Court has determined that Plaintiffs have no property interests in the adjacent vacant lot, the Court will only address Plaintiffs' substantive due process claims with regards to the business (which includes the work permit) and liquor license.

Unless a fundamental right is violated, substantive due process requires only that the practice be rationally related to a legitimate government interest, meaning, "that the practice be neither arbitrary nor irrational." Lee v. City of Chicago, 330 F.3d 456, 467 (7th Cir. 2003). Where, as with Plaintiffs' claim, the substantive due process challenge involves only a property interest, a plaintiff must show "either the inadequacy of state law remedies or an independent constitutional violation" before the court will review the claims. Id. (quoting Doherty v. City of Chicago, 75 F.3d at 323-26 (7th Cir. 1996)).

As with their procedural due process claims, Plaintiffs' substantive due process claims fail to allege the inadequacy of state law remedies. When a Plaintiff alleges a regulatory takings claim, it will only be ripe for adjudication after the Plaintiff has pursued all available state remedies for seeking compensation. Williamson v. County Regional Planning Comms'n v. Hamilton Bank, 473 U.S. 172, 194 (1985). Plaintiffs have not sufficiently alleged an exhaustion of all state remedies; therefore, this claim is dismissed without prejudice.

Secondly, the Court must address whether Plaintiffs sufficiently allege an independent constitutional violation. Though unclear from their Complaint, in their Response to the City Defendants' Motion to Dismiss, Plaintiffs contend that their substantive due process claims are

premised on violations of the Fourth and Fourteenth Amendments. However, Plaintiffs' Fourth and Fourteenth Amendment claims cannot be used to support their substantive due process claim. "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." Tesch v. County of Green Lake, 157 F.3d 465, 471 (7th Cir. 1998) (quoting U.S. v. Lanier, 520 U.S. 259, 271, n.7 (1997)); see also Albright v. Oliver, 510 U.S. 266, 273 (1994) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)) (If "a particular amendment 'provides an explicit textual source of constitutional protection' against a particular source of government behavior 'that Amendment, not the more generalized notion of 'substantive due process', must be the guide for analyzing these claims.' "). Therefore, Plaintiffs' substantive due process claims are dismissed with prejudice, as they cannot state a claim upon which relief can be granted.[7]

### B. Plaintiffs' Claims Against Father Pfleger and the Catholic Bishop of Chicago

#### 1. Plaintiffs' Allegations

Plaintiffs' Complaint alleges that Father Pfleger and his parishioners visited Plaintiffs' store, made various complaints, then complained to City officials about potential municipal code violations. Shortly thereafter, the City would cite the Plaintiffs for those violations. Plaintiffs' Complaint appears to imply that Father Pfleger and his parishioners reported the violations for the purpose of forcing the Plaintiffs out of business. It is on this basis that Plaintiffs base their claims against Father Pfleger and the Catholic Bishop of Chicago.

---

[7] The Court will address Plaintiffs' Fourteenth Amendment claims when analyzing their claims under § 1985(3).

Father Pfleger and the Catholic Bishop of Chicago contend that the Noerr-Pennington doctrine provides absolute immunity to Father Pfleger, his parishioners, and the Catholic Bishop of Chicago, even if Father Pfleger can be deemed a "state actor." Plaintiffs contend that the Noerr-Pennington doctrine does not provide absolute immunity because Father Pfleger and his parishioners acted as "arms of the City" when reporting code violations.[8] Viewing all allegations in the light most favorable to Plaintiff, the Court must assume that Father Pfleger and his parishioners complained to the city for the purpose of forcing Plaintiffs out of business, and when they engaged in this behavior, they were state actors.

### 2. Does the Noerr-Pennington Doctrine Provide Absolute Immunity?

Citizens have a first amendment right to "petition the Government for a redress of grievances." Tarpley v. Keistler, 188 F.3d 788, 794 (7th Cir.1999). (citing U.S. CONST. amend. 1). Consequently, individuals may petition the government for official action favorable to their interests, even if the petitioning efforts harm the interests of others, and still be immune from suit. Id. (citing United Mine Workers of America v. Pennington, 381 U.S. 657, 670 (1965)). This is called Noerr-Pennington immunity. Id. The Noerr-Pennington doctrine was originally applied in antitrust cases. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); see also Pennington, 381 U.S. 657 (1965). However, its reach has been extended to other causes of actions, including allegations of civil rights violations under § 1983. Tarpley, 188 F.3d 788, 794 (7th Cir.1999) (citing Nickum v. Village of Saybrook, 972 F. Supp.1160, 1171 (C.D. Ill. 1997)). Noerr-Pennington's extension to civil rights cases is

---

[8] Plaintiffs contends that members of the St. Sabina Parish received City training prior to reporting Plaintiffs' Municipal Code violations to the City. (See Pl. Response to Father Pfleger and Catholic Bishop, p.2).

applicable in this circumstance. Under the Noerr-Pennington doctrine, Father Pfleger and his parishioners could petition the City government solely for their own interest, even if those interests were detrimental to the Plaintiffs. The First Amendment right to petition is "absolutely privileged from attack under the Civil Rights Act of 1871." Reichenberger v.Pritchard, 660 F.2d 280, 288-89 (7th Cir. 1981) (holding that the Noerr-Pennington doctrine bars Section 1985(3) claims arising from private lobbying efforts).

Plaintiffs contend that because Father Pfleger and his parishioners engaged in behavior that can be construed as state action, the Noerr-Pennington doctrine is inapplicable, and the Defendants cannot receive absolute immunity from suit. However, in Tarpley, the Seventh Circuit held that even if a private party defendant could be construed as a state actor, plaintiff's claims are still barred under the Noerr-Pennington doctrine. Tarpley, 188 F.3d at 793-94. Other Circuits have similarly held that private *and* state actors are protected under the Noerr-Pennington doctrine. See Mariana v. Fisher, 338 F.3d 189, 197-200 (3rd Cir. 2003) (holding that lobbying activities of state actors are protected by the Noerr-Pennington doctrine); Manistee Town Center v. City of Glendale, 227 F.3d 1090, 1092-94 (9th Cir. 2000) (holding that the lobbying activities of governmental entities and officials are protected by Noerr-Pennington); Miracle Mile Associates v. City of Rochester, 617 F.2d 18 (2nd Cir. 1980) (holding the lobbying activities of city and city officials are protected by Noerr-Pennington). Therefore, although Father Pfleger and his parishioners may be considered state actors, the Noerr-Pennington doctrine is applicable to their city lobbying activities. Consequently, Father Pfleger and the Catholic Bishop of Chicago are absolutely immune from suit for their petitioning efforts.

Because the Noerr-Pennington doctrine bars Plaintiffs' claims against Father Pfleger and his parishioners, the Plaintiffs cannot state a claim against those defendants for conspiracy under §1985(3).[9] Courts have held that the Noerr-Pennington doctrine shields defendants from civil conspiracy allegations in violation of §1983. Nickum v. Village of Saybrook, 972 F.Supp. 1160, 1171 (C.D. Ill. 1997) (citing Video Intl Prod., Inc. v. Warner-Amex Cable Communications Inc., 858 F.2d 1075 (5th Cir. 1988)); see also City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365 (1991).

> a. Is the "Sham" Exception to the Noerr-Pennington Doctrine Applicable to Plaintiffs' Claims?

There is a "sham" exception to the Noerr-Pennington doctrine. The "sham" exception encompasses situations "in which a publicity campaign, ostensibly directed toward influencing governmental actions, is a mere sham to cover what is actually...an attempt to interfere directly with the business relationships of a competitor." Noerr, 365 U.S. at 144. In order to invoke the sham exception to the Noerr-Pennington doctrine, the Plaintiff must allege that the defendant was not genuinely interested in influencing government action. Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 57-60 (1993).

---

[9] Section 1985 (3), in relevant part, states:
> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws...the party so injured or deprived may have an action for damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The "sham" exception is inapplicable to Plaintiffs' claims against Father Pfleger and his parishioners. Plaintiffs and Father Pfleger are not business competitors. Additionally, the Complaint alleges that Father Pfleger and his parishioners engaged in the petitioning activity specifically to influence City officials in order to force Plaintiffs out of business. Consequently, the Noerr-Pennington doctrine bars all claims against Father Pfleger and the Catholic Bishop of Chicago, including Plaintiffs' claims of a conspiracy under Section 1985(3). Therefore, all claims against Father Pfleger and the Catholic Bishop of Chicago are dismissed with prejudice.

### C. Plaintiffs' Count III Section 1985(3) Claims Against City Defendants

Because all claims against Father Pfleger and the Catholic Bishop of Chicago have been dismissed, the Court must analyze whether Plaintiffs can maintain their §1985 (3) Claim against the City Defendants. Four elements are necessary to properly allege a conspiracy under §1985(3): (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal protection and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. Bowman v. City of Franklin, 980 F.2d 1104,1109 (7th Cir. 1992) (citing United Brotherhood of Carpenters and Joiners, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983)). The Court will address whether: (1) City officials, working for the same municipal entity, can engage in a conspiracy; and (2) Plaintiffs have sufficiently alleged some type of class-based discrimination under § 1985(3).

### 1. Does the Intra-Corporation Conspiracy Doctrine Preclude a Conspiracy Between City Defendants

The Seventh Circuit has adopted the rule that a corporation cannot conspire with its own agents or employees. Allen v. City of Chicago, 828 F.Supp. 543, 564 (N.D. Ill. 1993) (citing Travis v. Gary Community Mental Health Center, Inc., 921 F.2d 108, 110-11 (7th Cir. 1990)). Allen held that the intra-corporation conspiracy doctrine applies equally to public and private entities, and all employees of a city are part of the same "municipal corporation." Allen, 828 F. Supp. at 564. It is undisputed that all of the City Defendants are officials or employees of the City of Chicago. As a consequence, they are all part of the same "municipal corporation." Therefore, because all claims against Father Pfleger and the Catholic Bishop of Chicago have been dismissed, Plaintiff cannot sustain his claim under §1985 (3), as all City Defendants are part of the same entity, and the intra-corporate conspiracy doctrine bars allegations of conspiracy. Therefore, Count II of Plaintiffs' Complaint is dismissed with prejudice.

### 2. Have Plaintiffs Sufficiently Alleged Class Based Discrimination[10]

To meet the second element of a conspiracy under § 1985(3), the Plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." Roach v. City of Evansville, 111 F.3d 544, 547 (7th Cir. 1997) (citing Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)); See Also Allen, 828 F.Supp. at 564 (citing Grimes v. Smith, 776 F.2d 1359, 1366 (7th Cir. 1985)) ("The Seventh Circuit has

---

[10] Although the applicability of the intra-corporation conspiracy doctrine moots the issue of whether Plaintiffs sufficiently alleged any type of class based discrimination under § 1985(3), the Court will still address this issue to determine whether the Plaintiff has an independent cause of action under the Fourteenth Amendment.

explicitly held that conspiracy claims brought pursuant to § 1985 (3) do not reach nonracial, political conspiracies.")). Plaintiffs' conspiracy allegations allege a political conspiracy, and Plaintiffs make clear in their Response to Father Pfleger and Catholic Bishop of Chicago's motion to dismiss that this is not about racial discrimination. Consequently, Plaintiffs do not allege any type of class-based discrimination for purposes of § 1985(3).

Plaintiffs contend that the "class" under which they bring suit is the "class of one" equal protection theory. In order to bring a successful claim under this theory, the Plaintiffs must show that they were: (1) "intentionally treated different from others similarly situated and that there is no rational basis for the difference in treatment" or (2) "that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a 'totally illegitimate animus toward the plaintiff by the defendant.' " Nevel v. Village of Schaumburg, 297 F.3d 673, 681(7th Cir. 2002). (citing Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001)). Under the second approach, if the government would have taken the action anyway, the animus will not condemn the action. Id. "Ill will must be the sole cause of the complained-of action." Id.[11]

Notwithstanding Plaintiffs' lack of a sufficient claim under § 1985(3), the Plaintiffs can proceed against the City Defendants under a class of one equal protection theory. Plaintiffs' Complaint provides sufficient allegations and facts to state a claim under the class of one equal

---

[11]    Various courts have held that a "class of one" theory cannot be used to support a claim under Section 1985(3) See Burns v. State Police Association of Massachusetts, 230 F.3d 8, 12, n.4 (1st Cir. 2000) (a § 1985 equal protection claim requires race or other invidious discrimination); see also Undofer v. University of Toledo, 2002 WL 1263957 at *2 (6th Cir. June 5, 2002) (class of one allegations do not state a cause of action under § 1985).

protection theory. Therefore, Plaintiffs' Fourteenth Amendment claims against the City Defendants are dismissed without prejudice. Plaintiffs are granted leave to plead their Fourteenth Amendment claims as an action independent of their dismissed § 1985(3) claims.

## CONCLUSION

For the foregoing reasons, both motions to dismiss are granted. All claims against Father Pfleger and the Catholic Bishop of Chicago are dismissed, with prejudice, in their entirety. Additionally, City Defendants' partial motion to dismiss is granted. The following claims are dismissed with prejudice: (1) Plaintiffs' substantive due process claims; and (2) Count II of Plaintiffs' Complaint. The following claims are dismissed without prejudice: (1) Claims of municipal and official capacity liability (with the exception of John Robertson, where the official *and* individual capacity claims are dismissed without prejudice); (2) Plaintiffs' procedural due process claims; and (3) Any Fourteenth Amendment claims that are independent of the claims raised in Plaintiffs' Section 1985(3) cause of action.

Enter:

_____
David H. Coar
United States District Judge

Dated: **March 31, 2004**