**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AIDA FOOD AND LIQUOR, Inc., and** | ) | |
| **EASSA FAKHOURY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 03 C 4341** |
| **v.** | ) | |
| **CITY OF CHICAGO, a municipal** | ) | **HONORABLE DAVID H. COAR** |
| **corporation, JOHN ROBERSON,** | ) | |
| **individually and in his capacity as** | ) | |
| **Department of Buildings Commissioner,** | ) | |
| **TIMOTHY HUTCHINSON, individually** | ) | |
| **and in his capacity as Department of** | ) | |
| **Buildings Deputy Commissioner, DON** | ) | |
| **GIBSON, individually and in his capacity as** | ) | |
| **Department of Buildings inspector,** | ) | |
| **CECILIA COFFMAN, individually and in** | ) | |
| **her capacity as Department of Public Health** | ) | |
| **Inspector, LATASHA R. THOMAS,** | ) | |
| **individually and in her capacity as Alderman** | ) | |
| **of the 17th Ward** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Before this court is Defendants' City of Chicago, John Roberson, Timothy Hutchinson, Don

Gibson, Cecile Coffman, and Latasha Thomas' (hereinafter referred to as the "City Defendants")

motion for summary judgment. For the reasons set forth below, the City Defendants' motion for

summary judgment is GRANTED in its entirety.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003). (quoting Fed. R. Civ. P. 56(c)).

When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and makes all reasonable inferences in her favor. See Haywood v. Lucent Technologies, Inc., 323 F.3d 524 (7th Cir. 2003). The Court accepts the non-moving party's version of any disputed facts, but only if those facts are supported by relevant, admissible evidence. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

The moving party has the burden of demonstrating the absence of genuine issues of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving party must set forth specific facts that demonstrate the existence of a genuine issue of material fact for trial. Rule 56(e); Celotex, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the non-moving party cannot rest on the pleadings alone but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

## II. FACTS[1]

Plaintiff Aida is a family operated convenience store, located at 7923 S. Halsted Street, in Chicago, Illinois. Aida sells packaged goods, groceries and liquor. Plaintiff Eassa Fakhoury ("Fakhoury") is the President and sole shareholder of Aida. Plaintiffs' allegations against Defendants arise from a June 2000 letter that Fakhoury received from the City of Chicago Department of Planning and Development, indicating that the U.S. Department of Housing intended to take the property located at 7923 S. Halsted by eminent domain. Plaintiffs contend that the City wanted to acquire the property by eminent domain because developments that the City, State and Federal governments made around Fakhoury's property doubled Fakhoury's property value, thereby making the property highly desirable to the City and certain other real estate investors. (See Am. Compl., ¶ 6). After receiving the June 2000 letter, Fakhoury did not receive any further correspondence from the City of Chicago. However, Fakhoury claims that after he received the June 29, 2000 letter, the City began to initiate efforts to shut Plaintiffs' store down, so that the value of Plaintiffs' property would be significantly reduced by not having an operating store, thereby turning it into a "quick grab property."

The actions that Plaintiffs allege the City engaged in to turn Aida into a "quick grab property" fall into four categories. Plaintiffs allege that the City Defendants: (1) conducted numerous "sham" inspections of Aida, that ultimately led to Aida's temporary shut down; (2) refused to issue a building permit that would lead to the necessary repairs to re-open the store; (3)

---

[1] Unless otherwise noted, all facts are taken from the Parties' Local Rule 56.1 materials.

revoked Plaintiff's liquor license; and (4) declined to sell the empty adjacent lot to Plaintiffs. Each of these four categories will be addressed in turn.

### *A. City Inspectors' Visits to Aida*

#### *1. Department of Health Inspections*

Defendant Cecile Coffman (hereinafter referred to as "Inspector Coffman" or "Coffman"), is a Sanitation II inspector for the City of Chicago Department of Public Health. Between January 2001 and December 2002, Coffman conducted five reported routine inspections, and two "re-inspections" of Aida. In addition, Plaintiffs contend that Coffman made numerous unreported inspections to Aida. (See Def. Ex. 8 Fakhoury Dep., p. 74 lines 16-24; p. 164, lines 20-23). In addition, Plaintiffs contend that all of inspections were sham inspections, and most violations were contrived in an attempt to shut down Aida. Coffman's findings during each inspection are discussed below.

On February 22, 2001, Coffman inspected Aida pursuant to a routine, unannounced inspection. In the course of that inspection, Coffman recorded a number of violations. First, the front door had at least a two to three inch gap underneath it, and, according to Coffman, that gap showed that the door was inadequately rodent-proof. A citation was issued for this violation. Second, all of the items contained in the deli case were at temperatures above those mandated by law. Specifically, the turkey sandwiches, ham and salami were measured at 50 degrees, and the deli turkey was measured at 48 degrees.[2] A citation was also issued for this violation. Additionally, Inspector Coffman found a number of other minor violations which she noted on the inspection report, but for which she did not issue citations.

_____

[2] All potentially hazardous foods must be stored at or below 40 degrees.

On March 1, 2001, Inspector Coffman returned to Aida for a reinspection following the citations issued on February 22, 2001. In the course of the inspection, she determined that the previously existing problem with the front door had not been corrected. Additionally, she found that the sewage drain in the basement was clogged, and found evidence of human feces on the floor area surrounding the drain. Inspector Coffman issued citations for both of these violations. Similarly, the previous minor violations had not been corrected; in some instances, the minor violations worsened. As a result of these continuing violations, Aida's license was suspended by the Department of Health, and the store was closed. Plaintiffs remedied the violations, and Aida's license was reinstated on March 2, 2001.

On July 3, 2001, Inspector Coffman returned to Aida pursuant to a routine inspection. In the course of that inspection, she found a few minor violations, which were noted in her inspection report, but she did not issue any citations. Additionally, the meat temperatures in the deli cooler again were above 40 degrees (though not as high as they were on the February 22, 2001 inspection).

On November 16, 2001, Inspector Coffman returned to Aida for a routine inspection. In the course of that inspection, she found that most meats in the deli case were well above 50 degrees (i.e., polish sausages at 56 degrees, turkey sandwiches at 58.9 degrees, ham sandwiches at 57.8 degrees). A citation was issued for this violation and Aida was instructed to discontinue using the deli case until it was repaired. Additionally, Inspector Coffman noted a number of minor violations for which citations were not issued. On November 23, 2001, Coffman returned to Aida for reinspection, and to follow up on the citations she issued on November 16, 2001. At

that time, she determined that the deli case had been repaired. No citations were issued during this inspection.[3]

On June 12 , 2002, Inspector Coffman returned to Aida for a routine inspection. Although she found a number of minor violations, she did not issue any citations at this inspection. On December 16, 2002, Coffman returned to Aida for a routine inspection. While Coffman noted minor violations, she did not issue any citations at that inspection. Defendants contend that Coffman did not return to Aida to do any other inspections, because she was assigned to a different geographic area of the City. However, Plaintiffs contend that Inspector Coffman did not cease her inspections of Aida until Plaintiffs filed suit in this Court.[4]

## 2. Department of Buildings Inspections

_____The Department of Buildings is responsible for ensuring that structures in the City of Chicago are in a safe and well maintained condition, and comply with the provisions of the Building Code. The Department of Buildings has an enumerated policy on how to handle building inspections that are precipitated by a citizen complaint. The policy is as follows: 1) the inspector goes to the location; 2) asks the owner for consent to perform the inspection; (3) if consent is granted, the inspection takes place, but if consent is not granted, the inspector leaves the building and does not attempt to force entry or an inspection. If the owner does not consent to an inspection, the Department of Buildings may attempt to obtain entry through legal recourse

---

[3] Plaintiffs contend that the deli case, and the entire deli, contained new equipment, and a new thermometer. As such, Plaintiffs contend, the deli case never needed to be repaired.

[4] In addition, Plaintiffs allege that Daniel Sabeil, a Department of Health inspector, came to inspect Aida on December 5, 2002. However, Defendants have no record that Daniel Sabeil is (or ever was) a Department of Health employee.

(i.e., by obtaining a warrant). The relevant Department of Buildings' inspections will be addressed in turn.

### a. Inspector Callahan's Inspections

In early 2002, the Mayor's Office requested the Department of Buildings to conduct an area survey of all buildings on Halsted Street from 55th Street to 95th Street for purposes of redevelopment plans for the area. Aida was within the area of the survey. On February 22, 2002, Department of Buildings inspector Kevin Callahan ("Inspector Callahan") conducted an inspection of Aida pursuant to the survey of the area. In the course of that inspection, Inspector Callahan discovered a number of Building Code violations for which citations were issued.[5] Subsequently, a lawsuit was filed in the Housing Division of the Circuit Court of Cook County, Illinois, Municipal Division, Case Number 02 MI-403123 (hereinafter referred to as the "State Court Case").

On August 16, 2002, Circuit Court of Cook County Judge Nancy Drew Sheehan ("Judge Sheehan") entered an order in the City's state court housing case, requiring Plaintiff to schedule, and to be present for, an interior inspection of the premises with the Department of Buildings. That order continued the matter until October 11, 2002.[6]

---

[5] While some of the cited violations involved electrical issues, Inspector Callahan would not have conducted a complete electrical inspection of the property, as he is a carpenter, not an electrician.

[6] In addition, Plaintiffs contend that because the matter was continued until October 11, 2002, they had until October 11, 2002 to make all necessary repair. However, the Order is silent as to when Plaintiffs needed to complete their repairs. See Def. App. Ex. 9.

<u>b.  Inspector Gibson's Inspections</u>

On August 22, 2002, Commissioner John Roberson ("Commissioner Roberson") ordered an electrical inspection to take place at Aida, pursuant to a citizen complaint made to his office regarding allegedly unsafe electrical conditions in the building.[7]  On August 22, 2002, Donald Gibson ("Gibson" or "Inspector Gibson"), an electrical inspector, was sent to the property at 7923 S. Halsted.  Gibson entered the store, went to Fakhoury, and showed his identification.  He stated that he wished to perform an electrical inspection of the store, and asked for permission to do so.  Fakhoury consented to the search, and asked one of his employees to take Gibson to the back of the building so that Gibson could perform an inspection.[8]  Gibson told Fakhoury that the power would need to be shut down, because of dangerous conditions, namely, because of open electrical boxes.  <u>See</u> Def. App. Ex. 8, Fakhoury Dep., p. 100, lines 1-9.  In addition, Gibson stated to Fakhoury that these violations were different than the ones cited by Judge Sheehan's August 16, 2002 Order.  <u>Id</u>. at lines15-18.

On approximately August 28, 2002, a second inspection was performed by Gibson. Gibson was accompanied by a police officer and two individuals from Commonwealth Edison.[9]

---

[7]Plaintiffs dispute the fact that Roberson ordered the inspection, however, the deposition testimony clearly shows that it was Roberson who ordered the inspection. <u>See</u> Def. App. Ex. 3,  Roberson Dep., p.55, line 9-p.56, line 11.

[8] Again, Plaintiffs dispute this fact; Fakhoury contends that he did not consent to the search. However, Fakhoury's own deposition testimony reveals that he did in fact consent to the search.  <u>See</u> Def. App. Ex. 8, Fakhoury Dep., p.94, line 15 - p.95, line 6.

[9] Plaintiffs contend that the two individuals that accompanied Gibson and the police officer were not from Commonwealth Edison. However, in his deposition, Fakhoury states that he saw approximately two people from Commonwealth Edison with Gibson, and Fakhoury saw the Commonwealth Edison truck stop by to shut down the power.  <u>See</u> Def. App. Ex. 8; Fakhoury Dep., p. 102, line 17-p.104, line 8.

Gibson's recommendation that Aida's power be shut off had to approved by one of his supervisors. Milton Patterson ("Patterson"), the Chief Electrical Inspector, and Assistant Commissioner for the Department of Buildings, reviewed Gibson's inspection report and photographs. Patterson concurred with Gibson that dangerous and hazardous conditions were present at the site, and contacted Commonwealth Edison. Patterson asked Commonwealth Edison to send its inspectors to Aida to perform an independent inspection of the property with Gibson. Patterson received a telephone call from one of the Commonwealth Edison inspectors at the site. The Commonwealth Edison inspector concurred in the opinion that there was evidence of theft of electrical service and that a dangerous condition existed. Subsequently, Patterson signed the "cut off" order authorizing Edison to turn off the electrical service to the building.

On September 23, 2002, Plaintiffs filed an emergency mandamus motion in the State Court case, requesting the State Court to require the Department of Buildings to issue a permit for the repairs that were needed at Aida. On September 24, 2002, Judge Cunningham entered an order (the "September 24 Order") granting Plaintiffs the right to have a licensed electrician begin work to correct the electrical violations cited by the City.[10] Judge Cunningham continued the matter until October 11, 2002. On October 8, 2002, the Department of Buildings amended its complaint in the City's state court housing case against Plaintiffs to include the electrical

_____

[10] The September 24, 2002 Order did not require the Department of Buildings to issue a permit to Plaintiffs, but rather, allowed the work to go forward without a permit. Plaintiffs contend that while the September 24, 2002 Order did not require the Department of Buildings to issue a permit, Judge Cunningham required the Department of Buildings to issue a permit within fourteen days (Plaintiffs maintain that Assistant Corporation Counsel, Mr. Grunewald, consented).

violations discovered in Gibson's inspection. On October 11, 2002, the City of Chicago voluntarily dismissed its amended complaint against Aida.[11]

c. Additional Department of Buildings (Attempted) Inspections

Plaintiffs allege that Department of Buildings inspector John Moran ("Moran") attempted to conduct a plumbing inspection at Aida on October 16, 2002. Plaintiff Fakhoury testified that he refused to permit Moran to enter the store, and once Fakhoury refused, Moran left the store. On October 17, 2002, Ed Shields, an electrical inspector, went to Aida to perform an inspection. Plaintiff denied Shields ("Shields") access to the building. Immediately following the denial, Shields left the store. In addition, Plaintiffs allege that on other unidentified occasions, unnamed City inspectors came to inspect Aida. City Defendants deny that these attempted inspections occurred, and state that there is no record that these surveys occurred.

*B. The City's Failure to Issue a Building Permit*

*1. Chinese Restaurant Permit Application*

Plaintiffs applied for a building permit (Plaintiffs erroneously use the term "work permits" in their Amended Complaint, but the correct term used by the Department of Buildings is "building permit") to do renovation work in the premises occupied by their tenant, a Chinese restaurant, New Ho Ho, located in Aida's building and next door to Aida's store. The Parties dispute whether Plaintiffs' permit application was ever submitted to the Department of Buildings. Defendants assert that no documents were produced, in response to litigation requests

---

[11]Plaintiffs contend that the City of Chicago withdrew its complaint only after corporation counsel recognized "the blatant corruption by city officials." In addition, Plaintiffs assert that the Department of Buildings refused to issue a work permit, in opposition to Judge Cunningham's September 24, 2002 order, and in opposition to the advice of their own corporation counsel.

by both sides, to show that Plaintiffs applied for this permit.  Plaintiffs contend that the Department of Buildings procedure to complete a permit application is to fill out and submit a form to the Department of Buildings, and no copy of the form is provided, and thus there would be no record of his application.

### 2. Building Permit Application

On or about September 11, 2002, Plaintiffs applied for a building permit from the Department of Buildings to do repairs at Aida, in order to remedy the electrical code violations cited by Inspector Gibson.  On September 11 and 12, 2002, Plaintiffs received approvals from various Building Department disciplines (i.e., electrical, plumbing, etc.), but needed final aldermanic approval.   Once an applicant received aldermanic approval, the applicant would need to receive final approval for the application by the application review specialist for the Department of Buildings before obtaining the permit.  Alderman  Peterson, the alderman for the 17th Ward prior to Alderman Latasha Thomas ("Alderman Thomas"), instructed that a "hold" be placed on all building permits in the area.[12]  The City contends that when Alderman Thomas succeeded Alderman Peterson, she maintained her aldermanic hold in the same areas.  The "hold" applied to a range of addresses that included, among others, 7201-7959 South Halsted, which encompassed Plaintiffs' property at 7923 South Halsted.   Fakhoury alleges that he

---

[12] Aldermanic holds are common throughout the City and are used to keep alderman aware of changes in their wards and to ensure that any changes are consistent with long term development goals and concerns of the residents.   Any property owner within the geographic area of the aldermanic hold has to contact the alderman to have the hold released.   Plaintiffs, without any citation to the record whatsover, dispute that there was an aldermanic hold. However, Plaintiffs applied for a building permit in May 2002 to replace the furnace at the Aida, and had to receive Alderman Thomas' approval and release of the hold for that permit application.  This fact tends to show that Plaintiffs were aware of the aldermanic hold process.

attempted to contact Alderman Thomas about his September 2002 permit application. Meetings were scheduled between Fakhoury and Alderman Thomas. However, Alderman Thomas had to cancel those meetings. In addition, Plaintiffs contend that Alderman Thomas did not answer Fakhoury's numerous telephone calls. On September 24, 2002, State Court Judge Cunningham entered an order that gave Plaintiffs permission to proceed with the electrical repairs without a building permit.

### C. Revocation of Plaintiff's Liquor License

Plaintiffs allege that the City Defendants caused Plaintiffs' liquor license to be revoked in the City of Chicago. There is a dispute between the Parties as to whether Aida's liquor license was in good standing with the City of Chicago's Licensing Committee. The records of the Mayor's Licensing Commission indicate that Aida's liquor license is in good standing and that the City has not sought revocation. Conversely, Plaintiffs contend that Aida's license was not in good standing with the City of Chicago and that the license would not be issued until all holds were resolved. Defendants contend that Aida was able to continue to sell liquor, and did not lose any liquor sales during the time Fakhoury contends his liquor license was revoked. However, Plaintiffs maintain that every six months, they had to go through additional administrative procedures to obtain a liquor license.

### D. Decline of Sale of Empty Lot Adjacent to Aida

Plaintiffs allege that they have made numerous attempts to purchase the empty lot adjacent to the Aida, located at 7921 South Halsted. Prior to selling property to a particular buyer, the City looks for recommendations from the ward's aldmerman. Fakhoury contends that he, as well as his attorney, contacted Alderman Thomas' office, and spoke with her regarding the

sale of the lot.   As of the date of the Parties' briefs, the property located at 7921 South Halsted is still owned by the City of Chicago, and has not been sold to another buyer.   Plaintiffs contend that Alderman Thomas is holding this lot so that she can sell it to a large retailer, such as Walgreens or CVS, after she drives Plaintiffs out of business, and is able to combine Plaintiff's building with the vacant City lot.

## III.  ANALYSIS

Plaintiffs' cause of action alleges violations of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.  Each alleged cause of action will be addressed in turn.

### A.  *Plaintiff's Fourth Amendment Claim*

Plaintiffs contend that on the basis of Defendants Robinson, Richardson and Thomas' policy and direction, Defendants Gibson and Coffman entered Plaintiffs' store and deprived Plaintiffs of their Fourth Amendment rights against unreasonable search and seizure by inspecting their store, and subsequently, shutting it down.  The Department of Public Health and the Department of Buildings Inspections will be addressed in turn.

#### 1.  *Department of Health Inspections*

Plaintiffs contend that Inspector Coffman's inspections were unreasonable searches and seizures, and were conducted solely in an attempt to shut Aida down, in order to allow the City to purchase the property.   As set forth in Section II.A.1 of this Opinion, between January 2001 and December 2002, Coffman inspected Aida on the following dates: (1) February 22, 2001 for an inspection; (2) March 1, 2001 for a reinspection; (3) July 3, 2001 for an inspection; (4) November 16, 2001 for an inspection; (5) November 23, 2001 for a reinspection; (6) June 12,

2002 for an inspection; and (7) December 16, 2002 for an inspection.  In addition, Plaintiffs contend that Coffman conducted numerous unreported inspections.  Plaintiffs contend that many of the violations cited were inaccurate or exaggerated, and were reported solely in an attempt to shut Aida down.

"[T]he Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes."  New York v. Burger, 482 U.S. 691, 699 (1987) (citing See v. City of Seattle, 387 U.S. 541, 543 (1967)).   This expectation applies not only to police searches conducted for gathering evidence, but also to administrative inspections designed to enforce regulatory statutes.  Burger, 482 U.S. at 699 (citing Marshall v. Barlow's Inc., 435 U.S. 307, 312-313 (1978)).  However, this expectation of privacy is different from, and less than, a similar expectation in an individual's home.  Id.  Further, this expectation is particularly attenuated in commercial property employed in "closely regulated" industries.  Id. (internal citations omitted).

In closely regulated industries, if a search is performed pursuant to a regulatory scheme, no warrant is required to perform that search, so long as three criteria are met.  Burger, 482 U.S. at 702.  First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made.  Second, the warrantless inspection must be necessary to further the regulatory scheme.  Third, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant (meaning the statute must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers).  Id. at 702-703 (internal citations omitted).

a.  Was There A Substantial Governmental Interest That Informs The
                        Regulatory Scheme Pursuant to Which The Search Was Made?

Aida, a food and liquor convenience store, is in a pervasively  regulated industry.  See
Contreras v. City of Chicago, 920 F.Supp 1370, 1389 (N.D. Ill. 1996).   "Governmental
regulation is 'pervasive' if the regulatory presence is so comprehensive and defined that the
business owner cannot help but be aware that his commercial property will be subject to periodic
inspections undertaken for specific purposes."  Lesser v. Epsy, 34 F.3d 1301, 1306 (7th Cir.
1994) (internal citations omitted).   Neither party disputes that there is a substantial government
interest in regulating the food industry.  Further, "[i]t would be an affront to common sense to
say that the public interest is not as deeply involved in the regulation of the food industry as it is
in the liquor and firearms industry."  Contreras, 920 F.Supp at 1390 (quoting North American
Cold Storage Co v. City of Chicago, 211 U.S. 306 (1908)).

        b.  Is the Warrantless Inspection Necessary to Further a Regulatory
                        Scheme?

The Supreme Court has recognized that in some industries, there is a necessity of surprise
in inspections.  Burger, 482 U.S. 691, 710 (1987).  Particularly, in the food industry, "requiring
City inspectors to obtain a warrant or provide notice to owners prior to conducting a health or
safety inspection could seriously frustrate enforcement of the City's health and sanitation
ordinances."  Contreras, 920 F.Supp. at 1390.  Consequently, the food industry is the type of
industry where there is a substantial government interest that informs the regulatory scheme
pursuant to which the search was made.

_____

c.  Does the Ordinance Provide an Adequate Substitute for a Warrant?

For an ordinance to provide an adequate substitute for a warrant; (1) it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope; and (2) it must limit the discretion of the inspecting officers.  <u>Burger</u>, 482 U.S. at 703.  A store owner must have an understanding that the inspections will be performed on a regular basis.  <u>Id</u>. at 711 (internal citations omitted).  In addition, the store owner must know that the inspections are being done pursuant to statute, and not at the direction of the inspecting official.  <u>Id</u>.  Further, the statute should put the business operator on notice as to who is authorized to conduct an inspection.  <u>Id</u>.

The Chicago Municipal Code provides the regulatory scheme upon which the Department of Health relies when conducting inspections of food establishments.  The Chicago Municipal Code states: "the department of health shall inspect all food establishments at least once every 6 months and as often as necessary to determine that the requirements of this Municipal Code are being complied with."  <u>Chicago Municipal Code</u>, § 7-42-010.  Further, the Chicago Board of Health Rules and Regulations, in relevant part, provide:

> Within the parameters specified in this section, the regulatory authority shall prioritize and conduct more frequent inspections based upon its assessment of a food establishment's history of compliance with this code and the establishment's potential as a vector of food-borne illness by evaluating: (1) past performance, for nonconformance with the Municipal Code or the Chicago Board of Health Rules or HAACP plan requirements that are critical; (2) past performances, for numerous or repeat violations of the Chicago Municipal Code or the Chicago Board of Health Rules and Regulations or HAACP plan requirements that are noncritical...

<u>See</u> Def.  App. Ex. 11; Chicago Board of Health, Rules and Regulations, Inspections Section 101, pp. 140-141.

Finally, in order to serve as an adequate substitute for a warrant, the statute must place some reasonable restraints on when, where and what the inspectors are permitted to inspect.

Burger, 482 U.S. at 711 (internal citations omitted). The Chicago Board of Health Rules and Regulations provide:

> [a]fter the regulatory authority presents official credentials and provides notice of the purpose of, and an intent to conduct, an inspection, the person in charge shall allow the regulatory authority to determine if the food establishment is in compliance with the Chicago Municipal Code and these rules and regulations by allowing access to the establishment, allowing inspection, and providing information and records specified in the Chicago Municipal Code and these Rules and Regulations which the regulatory authority is entitled according to law, during the food establishment's hours of operations and other reasonable times.

See Def. App. Ex. 11; Chicago Board of Health Rules and Regulations, Inspections Section 102, p. 141.

In addition, the Chicago Board of Health and Regulations define a "critical violation":

> A violation of the Municipal Code of Chicago or the Rules and Regulations of the Board of Health governing food establishments is a critical violation if the violation creates an imminent health hazard that cannot be corrected prior to the conclusion of the inspection.
>
> Critical violations include but are not limited to: . .(2) inadequate facilities to maintain proper temperature, (3) potentially hazardous food do not meet temperature requirement during: storage, preparation, display and service...(14) previous serious violations not corrected within the time specified by the regulatory authority.
>
> Critical violations that cannot be corrected during the inspection shall result in the issuance of a citation and closure of the food establishment.

See Def. App. Ex. 11; Chicago Board of Health Rules and Regulations, Inspections Section 105, p. 142.

Finally, the Chicago Municipal Code provides: "whenever an inspection indicates that the conditions in the food establishment create an imminent hazard to the public health, the license of the food establishment shall be immediately suspended, including whenever an inspection indicates that a critical violation exists which is not capable of being corrected prior to the conclusion of the inspection." See Def. App. Ex. 10; Chicago Municipal Code, § 7-42-035.

An examination of the evidence clearly shows that Coffman's inspections were conducted within the parameters of the Chicago Municipal Code and the Chicago Board of Health Rules and Regulations, a valid regulatory scheme, and as such, do not violate Plaintiffs' Fourth Amendment rights. As an initial matter, the City regulations provide that inspections should be conducted *at least* once every six months, so the regulations allow the Department of Health to conduct searches more than once every six months. In addition, the statutory scheme provides for more frequent inspections, once violations are found. Plaintiffs offer nothing to contest the validity of these violations (and even admit some violations, for example, in their Amended Complaint, Plaintiffs admit that there was a gap in the front door, although they state that the gap was not large enough to create any serious health problems. See Am. Compl., ¶ 16 ). Even assuming, as Plaintiffs state, that Inspector Coffman conducted numerous unreported inspections, her inspections cannot be considered excessive, especially considering that Inspector Coffman found critical violations. The regulations promulgate more frequent inspections when violations are found, and when critical violations are found that cannot be corrected during the inspection, the establishment must be shut down. Once Plaintiffs corrected violations, the store was able to re-open. Plaintiffs fail to raise a genuine issue of material fact concerning whether Coffman's inspections of Aida violated the Fourth Amendment.

## 2. Department of Buildings Inspections

The Department of Buildings has a clear policy on how to handle buildings inspections that are precipitated by a citizen complaint. The policy is as follows: 1) the inspector goes to the location; 2) the owner asks for consent to perform the inspection; 3) if consent is granted, the inspection takes place, but if consent is not granted, the inspector leaves the building and does not attempt to force entry or an inspection. Later, the Department of Buildings may attempt to obtain entry through legal recourse (i.e., by obtaining a warrant).

Plaintiffs contend that on August 22, 2002, Defendant Gibson might have initially entered Aida with permission, however, once Fakhoury realized Gibson's intention, Gibson had to call a police officer to force an inspection and/or a shutdown of the store, and thus, did not give permission for the inspection ordered by Gibson.[13]

In his deposition testimony, Fakhoury states that when Gibson arrived to conduct an inspection on August 22, 2002, Gibson showed Fakhoury identification, and asked to inspect the premises. Def. App. Ex. 8, Dep. of Fakhoury, p.94, line 20-p.5, line 6. Fakhoury consented to the inspection, and allowed Gibson to come in.

The undisputed testimony shows that Fakhoury consented to Gibson's search. Once a party consents to a search, the warrant requirement of the Fourth Amendment is waived. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). In order for consent to be valid, it must be freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 550 (1968). The determination of whether the consent was freely and voluntarily given is a factual one in which

---

[13] Plaintiffs do not contest that consent was granted for other Department of Buildings, or that if consent was denied, the inspector left the premises.

the court considers the totality of the circumstances. Id. at 226.   In this circumstance, Plaintiffs do not dispute that consent was freely and voluntarily given, yet.  Rather, Plaintiffs dispute whether consent was given to shut off the power.  As the Seventh Circuit has noted, "[The] Fourth Amendment protects against the intrusion against unreasonable searches, not against what authorities might do after they have conducted a reasonable search." Contreras v. City of Chicago, 119 F.3d 1286, 1291 (7th Cir. 1997).[14]   Consequently, here, where Plaintiffs do not dispute the reasonableness of the search, yet complain of the outcome of the search, no Fourth Amendment right is implicated.  As a consequence, Plaintiffs have failed to provide the Court with any evidence that would raise a genuine issue of material fact about the reasonableness of Gibson's search.[15]

---

[14] In Contreras, City of Chicago inspectors closed down a restaurant because of violations of the Health Code that they discovered during the course of an inspection. Id. at 1289.  The Court held that the inspectors' decision to close down the store did not implicate the Fourth Amendment.  Id. at 1291.

[15] Plaintiffs also attempt to raise genuine issues of material fact concerning who ordered the electrical search of Aida on August 22, 2002, and why the decision to order the search was made.  However, the undisputed testimony of John Roberson, the Department of Buildings Commissioner, states that he ordered the search, based upon a credible citizen's complaint.  See Def. App. Ex. 3; Roberson Dep., p.55, line 9-p.56, line 11.  Plaintiffs offer no evidence to refute this fact.  Second, Plaintiffs point to the fact that Dave Brown, who was one of Gibson's supervisors, did not agree with the results of Gibson's inspection.  However, this fact is irrelevant, because, as previously noted, the reasonableness of the search does not turn on its outcome.  Moreover, Gibson's decision to turn off the electrical power was endorsed and approved by Milton Patterson, the Chief Electrical Inspector for the City of Chicago (who is also Brown's supervisor).  See Def. App. Ex. 15; Patterson Dep., p. 57, lines 15-23; see also Def. App. Ex. 28; Def. App. Ex. 28.  Third, Plaintiffs attempt to argue that no Commonwealth Edison representatives assisted the City in shutting off the power, which occurred several days after Gibson's inspection on August 22, 2002.   It is not clear why Plaintiffs make this argument; nonetheless, Plaintiffs' argument is contradicted by Fakhoury's own deposition testimony.  In his deposition, Fakhoury states that he saw approximately two people from Commonwealth Edison with Gibson, and Fakhoury saw the Commonwealth Edison truck stop by to shut down the power.  See Def. App. Ex. 8; Fakhoury

-20-

*B.  Plaintiffs' Fifth Amendment Claims*

_____ Plaintiffs claim that Defendants deprived them of their Fifth Amendment procedural due process rights with respect to: (1) interference with their place of business; (2) the right to a building permit; and (3) the revocation of their liquor license.

To determine whether Plaintiffs have been deprived of procedural due process, the Court must determine whether: (1) the Plaintiffs have been deprived of a protected interest; and (2) if so, determine what process is due.  Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir. 1996) (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982)).  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  Doherty, 75 F.3d at 323.  The state is not always required to provide a pre-deprivation hearing when a loss involves property.  Hudson v. Palmer, 468 U.S. 517, 533 (1984). In Hudson, the Court held:

> An unauthorized intentional deprivation of [a property interest] does not constitute a violation of the procedural requirements of the Due Process clause if a meaningful postdeprivation remedy for the loss is available.  Id.  at 533. [A] complaint does not state a valid procedural due process clause objection–and a valid § 1983 claim--if it does not include a challenge to the fundamental fairness of the state's procedures...[I]f a procedural due process claim lacks a colorable objection to the validity of the State's procedures, no constitutional violation has been alleged.

Hudson, 468 U.S. at 539.  Therefore, a plaintiff must avail herself of the remedies guaranteed by state law, or demonstrate that the available state remedies are inadequate.

In their Amended Complaint, Plaintiffs allege that they availed themselves of all remedies guaranteed by state law, but those remedies were inadequate because: (1) the State Court lacked

Dep., p. 102, line 17-p.104, line 8.

jurisdiction to issue a writ of mandamus or an injunction against the City Defendants; (2) despite

obtaining an order from the Housing Court that allowed Plaintiffs to complete their electrical

work, Defendants continued to defy that court order, by sending more inspectors; (3) since the

State Court Order was in Plaintiffs' favor, there was no basis for an appeal; (4) because State

Court judges depend on City officials to be nominated for office every six years, or are appointed

by City officials, they are not independent and cannot, even if they wanted to, enjoin City

officials or hold them in contempt or grant punitive damages.

Plaintiffs' assertions are completely devoid of merit. It is well settled that Illinois Circuit

courts have jurisdiction to hear mandamus actions. See e.g., McClaughry v. Village of Antioch,

296 Ill.App.3d 636 (Ill. App. Ct. 1998): 735 ILCS 5/14-101 (the Illinois Mandamus Act).

Further, Plaintiffs' assertion are belied by Fakhoury's own actions. On September 23, 2002,

Fakhoury filed an emergency mandamus motion in the State Court case, requesting that the State

Court require the Department of Buildings to issue a permit for the repairs that were needed at

Aida. As a result of this action, although Plaintiffs did not receive a mandamus order to issue a

permit, Judge Cunningham did order the City, on September 24, 2002, to permit Plaintiffs to do

work regarding the electrical violations without a permit. Consequently, Defendants are correct

in their assertion that Plaintiffs' claim that state law remedies are inadequate are refuted by the

fact that Plaintiffs received the relief they requested. Finally, there is no credence whatsoever to

Plaintiffs' bald assertion that because Circuit Court judges allegedly "lack independence,"

Plaintiffs cannot receive adequate relief in state court. Not only is that statement completely

without merit, Plaintiffs did in fact receive the requested relief they desired in State Court

Consequently, because Plaintiffs have failed to show that they have availed themselves of all

remedies in State Court, or that those remedies are inadequate, Plaintiffs' procedural due process claim fails.

In addition, Plaintiffs bring a substantive due process claim pursuant to the Fifth Amendment (a takings claim). However, as with a procedural due process claim, with a substantive due process claim, the aggrieved party must show "either the inadequacy of state law remedies or an independent constitutional violation before the court will review the claims." Lee v. City of Chicago, 330 F.3d 456, 467 (7th Cir. 2003) (citing Doherty, 75 F.3d at 323-326). However, because Plaintiffs have failed to show the inadequacy of state law remedies, their takings claim fails.[16]

### C. Plaintiffs' Fourteenth Amendment Claims

Plaintiffs' Fourteenth Amendment claims allege that the City Defendants treat Aida differently from other similarly situated stores, including Osco, Walgreens and CVS. Specifically, Plaintiffs state that the City Defendants do not inspect these other stores in the same manner it inspects Aida, and the City Defendants interfere with Aida's business by shutting down the store and refusing to issue a work permit to correct electrical repairs, and in addition, revoked Plaintiff's liquor license. Further, Plaintiffs contend that the City Defendants refused to sell a vacant City lot to Plaintiffs, yet publicly sought to sell that lot to other persons and retail stores.

---

[16] As this Court noted in its March 31, 2004 Memorandum Opinion and Order, which addressed, among other things, Plaintiffs' Fifth Amendment claims, Plaintiffs' Fourth and Fourteenth Amendment claims cannot be used to support their substantive due process claims. See Aida v. City of Chicago, No. 03 C 4341, 2004 WL 719663 (N.D. Ill. 2004). As such, although Plaintiffs do not attempt to argue that an independent constitutional violation supports their takings claim, this argument was foreclosed in the Court's March 31, 2004 Memorandum Opinion and Argument.

Plaintiffs contend that this differential treatment is a totally illegitimate animus, or ill will, based on the City's failure, in the Circuit Court lawsuit, to shut down Aida.

Plaintiffs bring their Fourteenth Amendment claim pursuant to the "class of one" equal protection theory.   In order to bring a successful claim under this theory, the Plaintiffs must show that they were: (1) "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment"; or (2) "that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a 'totally illegitimate animus toward the plaintiff by defendant.' " Nevel v. Village of Schaumburg, 297 F.3d 673, 681 (7th Cir. 2002) (citing Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001)).  Under the second approach, if the government would have taken the action anyway, the animus will not condemn the action.  Id. "Ill will must be the sole cause of the complained-of action."  Id.

As an initial matter, Plaintiffs fail to cite to any evidence whatsoever of City Defendants treating similarly situated stores in a more favorable manner.  Plaintiffs assertion are wholly unsupported by any evidence or citations to the record.   For example, Plaintiffs cite to an article from the Chicago Defender, entitled "Ald. Thomas Declares War on Walgreens" to support their assertion that Alderman Thomas wanted to put Plaintiffs out of business so that she could put a Walgreens, or another chain drugstore or grocery store, on Plaintiffs' property.  See Pl. App., Ex . B.  However, this article makes no mention whatsoever of Plaintiff's store.  The article's focus is Alderman Thomas' displeasure at Walgreen's shut-down of its location at 79th and LaSalle, once Walgreens determined that it would build a store at 79th and Racine.   This is but one example of Plaintiffs' constant citation to evidence that clearly does not support the assertions they make.

Because Plaintiffs' unsupported assertions are insufficient to raise a genuine issue of material fact concerning whether Plaintiffs are similarly situated to other stores within the vicinity of Aida, Plaintiffs' Fourteenth Amendment claim fails.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety. This case is closed.[17]

Enter:

/s/ David H. Coar

_____

David H. Coar
United States District Judge

Dated: **March 29, 2005**

---

[17] The Court notes that it did not yet determine whether, pursuant to City Defendants' objection, whether Plaintiffs' Exhibit O should be admitted into evidence. Exhibit O is an affidavit submitted by Plaintiffs' attorney, Maurice Salem, in opposition to Defendants' motion for summary judgment. Defendants objected to this exhibit for the following reasons: (1) Plaintiffs failed to disclose Maurice Salem as a witness prior to the close of discovery; (2) the exhibit contained hearsay; (3) a lawyer should not act simultaneously as a witness and advocate for his client. After an examination of Plaintiffs' Exhibit O, even if this exhibit is considered along with Plaintiffs' other evidence in opposition to Defendants' motion for summary judgment, Plaintiffs still have insufficient evidence to refute Defendants' motion for summary judgment.